IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

IN RE:                                          :       CASE NO. 09-05922
                                                :
AIDA LUZ CHICO PENA                             :       CHAPTER 13
                                                :
        Debtor                                  :
                                                :
_____                 :
                                                :
SUCESION GONZALEZ COLLAZO                        :
COMPOSED OF EDA GONZALEZ                         :
COLLAZO; BLANCA GONZALEZ                         :
COLLAZO; BRENDA GONZALEZ                         :
RAMOS; FELIX GONZALEZ JIMENEZ;                   :
MARTA M. GONZALEZ; AND SONIA                     :
GONZALEZ BELTRAN                                 :       ADVERSARY NO. 10-00072
                                                :
        Plaintiff                               :
                                                :
vs.                                             :
                                                :
AIDA LUZ CHICO PENA; JEANNETTE                   :
VANESSA GONZALEZ CHICO; ROSA                     :
RAQUEL GONZALEZ CHICO; MARIA                     :
DEL CARMEN GONZALEZ CHICO;                       :
BLANCA GONZALEZ CHICO;                           :
WESTERNBANK OF PUERTO RICO;                      :
BANCO POPULAR DE PUERTO RICO                     :
THE FEDERAL DEPOSIT INSURANCE                    :
CORPORATION; JOHN DOE &                          :
RICHARD DOE; INSURANCE                           :
COMPANIES X, Y, AND/OR Z                         :
                                                :
        Defendants                              :
_____                 :

## OPINION AND ORDER

This adversary proceeding came before the court on April 30, 2012 for a trial to determine if certain properties claimed by the debtor as hers are property of the estate. The trial was held after the court had entered orders on two dispositive motions. The motions are incorporated herein to better understand the complex legal issues of civil law involved in this case.

## Background

The first time this adversary proceeding came before the court was on Plaintiff's motion for summary judgment. The court entered an Opinion and Order holding that; (i) the doctrine of acquisitive prescription *secundum tabulas* was inapplicable in the instant case; and (ii) the Sucesión

González Collazo, composed of Eda González Collazo; Blanca González Collazo; Brenda González Ramos; Félix González Jiménez; Marta M. González Collazo; and Sonia González Beltrán (hereinafter referred to as "Sucesión González Collazo" and "Plaintiff") had not placed the court in a position to adjudicate whether the doctrine of relative contractual simulation was applicable to the facts in this case since they did not specify which modality of the alleged relative contractual simulation occurred and whether the requirements of that modality were satisfied (Docket No. 81); See Collazo v. Pena (In re Pena), 458 B.R. 30 (D.P.R. 2011) [Sucesión González Collazo v. Chico Peña (In re Chico Peña)].

On November 4, 2011, a pre-trial hearing was held. After a brief exchange of motions, the Defendants stated that their position regarding the private document executed between Ms. Aida Luz Chico Peña (hereinafter referred to as "Ms. Chico") and Mr. Félix González Figueroa is that it, "...just acknowledges that the properties in question were acquired by Ms. Chico with moneys given to her by Mr. González [Figueroa] ." (Docket No. 90). The Defendants' argue that the only pending issue was the underlying purpose for the monies that were given to Ms. Chico. The Defendants suggest that the monies could have been given to Ms. Chico for the specific purpose of purchasing the properties under her name or the monies could have been a gift from Mr. Félix González Figueroa which might entail ineffective donation implications, but Ms. Chico's subsequent purchase of the properties with those monies does not constitute a simulated contract. Plaintiff answered alleging that: (i) "defendants now try to raise the possibility that a donation [of monies to Ms. Chico] occurred even when the [p]rivate [d]ocument that has been so vastly discussed doesn't point to that direction;" and (ii) Defendants are precluded from raising this claim since they did not do it in the answer to the complaint and thus, are barred by the law of the case doctrine (Docket No. 92).

The second time this proceeding came before the court on a dispositive motion was on January 4, 2012 when the Plaintiff filed a Motion for Summary Judgment and Memorandum of Law in Support of its motion arguing that; (i) Mr. Félix González and Defendant were part of a relative simulated contract in which Ms. Chico "first bought four properties in the name of the second [Mr. Félix González] with the intention of concealing the truth and by that way those properties would eventually be received by the daughters of both as inheritance;" (Docket No. 93, pg. 5); (ii) in this

case relative simulation occurred in the identity or in the subjects of the contract when the Defendant (Ms. Chico) was interposed between the seller and Mr. Félix González, who was the real buyer (purchaser) of the properties in controversy; thus concealing that Mr. Félix González was the real purchaser of the real properties; (iii) the counterdocument or conterstatement (the private document signed by both Ms. Chico and Mr. Félix González before Notary Public in Lares, Puerto Rico on June 18, 1981) reveals that Mr. Félix González's intentions were that these properties would be given as an inheritance to his daughters; (iv) Mr. Félix González bought the properties under the name of Ms. Chico because he did not want third parties to know that he was the real buyer since the monies used for these asset purchases were part of the conjugal partnership that existed at the time between Mr. Félix González and his wife Mrs. Juana Collazo; (v) the private document signed by Mr. Félix González does not constitute a testament or will under the Puerto Rico Civil Code; (vi) the private document (counterdocument) signed by Mr. Félix González and Ms. Chico constitutes a pact over future inheritance which is not amongst the exceptions allowed pursuant to Puerto Rico Civil Code; thus it is null and void; and (vii) Mr. Félix González and Ms. Chico had a "queridato" relationship (defined by the Plaintiff as, "...the people involved in the relationship have a limitation to get married because one of the concubines is married to a third person") which means that any property bought by Mr. Félix González will bear the presumption of being owned by the conjugal partnership comprised by Mr. Félix González and his then wife Mrs. Juana Collazo; thus any "property owned in common with a 'querida' would be owned by such concubine and the conjugal relationship (composed of Félix [González] and his wife Mrs. Juana [Collazo])" (Docket No. 93, pgs. 11-12). On January 4, 2012, the Plaintiff also filed its Statement of Undisputed Facts in Support of its Motion for Summary Judgment (Docket No. 94) which consists of the same uncontested material facts included in the September 8, 2011 Opinion and Order (Docket No. 81). On January 13, 2012, the Defendants filed their Opposition to the Second Motion for Summary Judgment and their Cross Motion for Summary Judgment which is devoid of legal arguments but rather presents a factual issue which is whether the monies used by Ms. Chico to purchase the properties in controversy were given to her by Mr. Félix González "...as a gift, donation or in consideration [of] the children which both engendered" (Docket No. 99-3). Ms. Chico in her affidavit states that; "[d]uring my long-term

relationship with Mr. Félix González he sporadically gave me money to defray the costs of rearing our daughters. I saved most of those disbursements and eventually used them to buy the properties subject of the above captioned case" (Docket 99-2, Affidavit of Defendant Ms. Chico). On January 13, 2012, the Plaintiff filed its Answer to Defendants' Cross Motion for Summary Judgment arguing that Defendants are barred by the law of the case doctrine from presenting at this stage in the case a new defense (argument) that was never brought before this court or before the state court and is evidenced by Ms. Chico's self-serving affidavit (Docket No. 100).

On January 20, 2012 a hearing was held in which the court found that there was a controversy of material fact regarding the intent of the parties on the use of the funds advanced by Mr. Félix González to Ms. Chico which is critical in determining the legal effect or existence of a simulated contract or counterdocument. Trial was scheduled for April 30, 2012

The Trial

On April 30, 2012 a trial was held.  The court *sua sponte* noted in open court that the finding of fact number 5 included in the September 8, 2011 Opinion and Order makes reference that in the private document executed on June 18, 1981 the parties acknowledged that 4 properties were purchased. It is uncontested that Ms. Chico bought 4 properties. The court clarified that upon the court's reexamination of all the documents, it found a gap between the private document and finding of fact number 5. The gap consists in that the private document only includes two (2) properties; namely A and B. Properties C and D, the ones at Echegaray Street, are not included in the private document. The court further clarified that it was not changing (altering) the legal conclusion of its September 8, 2011 Opinion and Order, but rather clarifying a finding of fact, albeit uncontested by the parties.

Two witness were presented at trial.  However, their credible testimony did not provide any significant evidence in support of the issue before the court. Thus, the court's decision is substantially based on the uncontested facts agreed to by the parties and detailed in the September 8, 2011 Opinion and Order.

*Defendants' witness: Ms. Aida Luz Chico Peña*

Ms. Chico testified that she was sixty-eight years (68) old and has lived in Lares, Puerto Rico

all her life. She stated that she was sixteen (16) years old when she first met Mr. Félix González Figueroa. Ms. Chico further testified that she lived with Mr. Félix González Figueroa and that he was her husband (not legally) and the father of her five (5) daughters. She stated that she had a relationship with Mr. Félix González for nearly thirty eight (38) years and that the same ended when he passed away. Ms. Chico testified that Mr. Félix González used to giver her $200 dollars, then $800 dollars to help sustain economically their five (5) daughters. She also stated that she worked for a while after becoming acquainted with Mr. González Figueroa and that she was able to save.

Ms. Chico stated that she was familiar with the four (4) properties in Lares located at #126 Comercio Street, #123 Comercio Street, #4 Echegaray Street and #5 Echegaray Street, because these are her properties. Ms. Chico further stated that she acquired these four (4) properties with the funds she obtained when she sold a house that she used to live in and bought the house she now lives in and the house next door. She testified that Mr. González Figueroa prepared the private agreement at the time because he wanted to avoid problems amongst the families in the event of his absence (death), because at the time the private agreement was signed he had five (5) daughters, all minors/under age at the time, with her and he also had another family. Moreover, she explained that Mr. González Figueroa's other family did not like her daughters or herself; thus, the private agreement was drafted and signed by both Ms. Chico and Mr. González Figueroa to avoid problems. She testified that she signed the private document dated June 18, 1981. Ms. Chico read paragraph #4 of the private document which provided that; "the declarants make it known for the record that the monies disbursed by Mr. Félix González Figueroa as explained in paragraphs two (2) and three (3) are on the concept of an advance of the inheritance that upon his death shall correspond to his five (5) daughters that have the last name of González Chico as mentioned in paragraph one (1) and thus is accepted by Mrs. Aida Luz Chico Peña."

Ms. Chico further testified that she knew that Mr. Félix González Figueroa was married to Mrs. Juana Collazo. However, she clarified that Mr. Félix González Figueroa was her husband because he was the father of her five (5) daughters and she lived with him for so many years. Ms. Chico stated that she lived with Mr. Félix González from the time she became acquainted with him and that he set her up in a house.

The court does not find credible that Ms. Chico was able to save money in a sufficient amount to purchase the properties in question. The monthly amounts given by Mr. Félix González Figueroa were barely sufficient to sustain her and her five daughters. The credible testimony does not rebut the statements in the private document.

*Plaintiff's witness: Ms. Blanca González Collazo*

Ms. Blanca González Collazo testified as a rebuttal witness and stated that she is the daughter of Mr. Félix González Figueroa and Mrs. Juana Collazo. She has never been married and has lived with her parents all her life. Ms. Blanca González Collazo testified that she lived with her father until his death. She further testified that her father never abandoned the family house and that he always slept at their house. Ms. Blanca González Collazo stated that her father always had breakfast at nine in the morning and that he was never absent at night. He usually got home between 9:00pm -9:30pm.

The testimony of Ms. Blanca González Collazo does not add any material evidence to the controversy before the court.

The Issue

The issue before the court is whether the properties presently under Ms. Chico's name are property of the estate which in turn hinges on whether the Plaintiff has established that there was a relative simulated contract in the modality of the identity or in the subjects of the contract in which Ms. Chico interposed as a straw person between the seller and Mr. Félix González. The Plaintiff argues that the counterdocument or counterstatement in the instant case is the dissimulated (underlying transaction) contract which reveals the real reason Mr. Félix González bought the properties under the name of Ms. Chico; namely, because Mr. Félix González did not want third parties to know that he was the real buyer because the monies used for these asset purchases were part of the conjugal partnership that existed at the time between Mr. Félix González and his wife Mrs. Juana Collazo. The underlying simulated transaction in the courterdocument is that the decedent, Mr. Félix González Figueroa, wanted certain real properties to constitute an advancement of the inheritance ("anticipo de herencia") to the five daughters he had in common with Ms. Chico.

Jurisdiction

This court has jurisdiction over this core proceeding pursuant to 28 U.S.C. §§157(b)(1),

(b)(2)(A,E,O) and 1334. Section 541(a)(1) includes, "all legal or equitable interests of the debtor in property." 11 U.S.C. §541(a)(1). Section 541(a)(1) includes the debtor's interests in real property. See Allan N. Resnick & Henry J. Sommer, 5 Collier on Bankruptcy ¶541.04 (16th ed. 2012). The scope and existence of the property interest must be determined pursuant to state law "unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." Butner v. United States, 440 U.S. 48, 55, 59 L. Ed. 2d 136, 99 S. Ct. 914 (1979); Beatrice v. Braunstein (In re Beatrice), 296 B.R. 576, 580 (1st Cir. B.A.P. 2003) citing In re Eastmare Dev. Corp., 150 B.R. 495 (Bankr. D. Mass. 1993), and McNeilly v. Geremia (In re McNeilly), 249 B.R. 576 (B.A.P. 1st Cir. 2000).

Uncontested Material Facts

1. Defendant Aida Luz Chico Peña and the decedent, Mr. Félix González Figueroa, were in a relationship in which they procreated the following five (5) daughters out of wedlock; Jannette Vanessa González Chico; Raquel González Chico; María Del Carmen González Chico; Rosa Milagros Gonzalez Chico; and Blanca Luz González Chico. Mr. Félix Gonzalez Figueroa was legally married to Mrs. Juana Collazo González.

2. Mr. Félix González Figueroa passed away on April 3, 2002 intestate. He was married to Mrs. Juana M. Collazo.

3. Ms. Aida Luz Chico Peña appears as the owner in the Property Registry, of the properties included in state court case number L AC2002-0054 and in the bankruptcy petition in case number 09-05922(ESL).

4. A private document was executed on June 18, 1981 between Ms. Aida Luz Chico Peña and Mr. Félix González Figueroa in which they both recognized that Ms. Aida Luz Chico Peña bought certain properties with monies received from Mr. Félix González Figueroa and registered the same under her name in the Property Registry. Ms. Aida Luz Chico Peña bought the following real estate properties:

> (A) "Property located at #126 Comercio Street, Lares, 2 story small building with 4 apartments. 1- 3 bedrooms and 1 bathroom; 2- 2 bedrooms and 1 bathroom; 3- 3 bedrooms and 1 bathroom; 4- 3 bedrooms and 1 bathroom."

7

(B) "Residential property located at #125 Comercio Street, Lares, PR, consisting of a 2 story concrete house with 4 bedrooms and 3 bathrooms, land of approximately 2 'cuerdas'"

(C) "Residential property located at #4 Echegaray Street, Lares, PR, consisting of a concrete house with 3 bedrooms and 1 bathroom."

(D) "Residential Property located at #5 Echegaray Street, Lares, PR, consisting of a concrete house with 4 bedrooms and 2 bathrooms and car port."

5. The properties listed in the preceding paragraph are the subject of the instant action.

6. In the above referenced private document, Mr. Félix González Figueroa and Ms. Aida Luz Chico Peña acknowledged that the properties that are registered under the name of Ms. Aida Luz Chico Peña were acquired with monies from Mr. Félix González Figueroa.

7. In the FIFTH paragraph of the private document signed by Mr. Félix González Figueroa and Ms. Aida Luz Chico Peña, the former expressed his intention that the properties bought under Ms. Aida Luz Chico Peña's name be given to the daughters they have in common in concept of their inheritance.

8. At the time the aforementioned private document was executed, Mr. Félix González Figueroa was married to Mrs. Juana Collazo. Mrs. Juana Collazo never appeared in this document to consent the transfer of property.

9. The private document was signed by Mr. Félix González Figueroa and Ms. Aida Luz Chico Peña before a Notary Public, in Lares, Puerto Rico. The court notes and highlights the admonition which turned into a presage of the outcome of this case:

SEVENTH: I, The Notary Public, having admonished the deponents of the convenience and desirability of what is herein expressed and accepted by them be done by Public Writ and Last Will and Testament, which they decide not to do at present, since Mr. Félix Gonzalez Figueroa wishes to reach an agreement with his wife and other heirs as to the properties that shall be adjudicated to each one of them at his death.

10. Mrs. Juana Collazo passed away on September 9, 1996.

11. Ms. Aida Luz Chico Peña is in the physical (natural) possession of the properties.

12. Ms. Aida Luz Chico Peña has been uninterruptedly in possession of the properties subject of this action since they were acquired under her name through public deeds in 1980 and 1981.

13. Ms. Aida Luz Chico Peña has been a resident of Lares, Puerto Rico all her life.

8

14. Ms. Aida Luz Chico knows from first hand knowledge that both Mr. Félix González Figueroa and Mrs. Juana Collazo, lived uninterruptedly in Lares, Puerto Rico, until their respective deaths.

15. The state court case was filed in the year 2002.

16. In the state court case, Marta Miriam González Collazo v. Félix González Collazo et als., Num. LAC 2002-00054, Ms. Aida Luz Chico Peña in a deposition (pg. 43 of the deposition transcript) regarding such case, testified on February 8, 2006, that she did not give Mr. Félix González money and what she would do to help him (Mr. Félix González) with the business was to "[t]hen pray to God so that everything will go well." She further admitted that Mr. Félix González Figueroa paid for everything, including utilities.

17. Ms. Aida Luz Chico Peña mortgaged one of the properties in #126 Comercio Street, Lares with Westernbank. Westernbank was closed by the Federal Deposit Insurance Corporation on April 30, 2010.

## Discussion

"Simulation suggests the idea of concealment or trickery (*ingannare* = to trick, conceal). F. De Castro y Bravo, El Negocio Jurídico 338, sec. 116, Madrid, Ed, Inst. Nac. Est. Jur. (1967). That is, 'in ordinary language, *simular* (to simulate) means to make believe what is not, and *disimular* (to dissimulate) means to conceal what is. Likewise, in legal language *simular* (to simulate) means to feign a reality, and *disimular* (to dissimulate) means the contrary; both concepts imply the idea of a purposeful fiction or concealment. In legal affairs, simulation in particular occurs when the parties in agreement deliberately make statements different from the internal will, in order to deceive third persons.' L. Cariota Ferrara, El Negocio Jurídico 440-441(M. Albaladejo trans.) Madrid, Ed. Aguilar (1956). This implies that, in simulated contracts, the contracting parties fully agree to produce an appearance before third persons. There is an agreement or common purpose to simulate. II-1 J. Puig Brutau, Fundamentos de Derecho Civil 486, Barcelona, Ed. Bosch (2nd. Ed. 1978)." Reyes v. Jusino, 116 D.P.R. 275, (1985), 16 P.R. Offic. Trans. 338, 347, April 3, 1985.

Plaintiff argues that the execution of the sale and purchase deeds for the above referenced real properties are not valid because the same are relative simulated contracts which have a corresponding dissimulated (underlying) contract that is materialized in a private agreement. The private agreement serves as a counterdocument or counterstatement which evinces the real transaction and intention of the parties concealed behind the simulated contract. The purpose behind the counterdocument or counterstatement is evidentiary in nature since the same is used by the contracting parties to protect their interests against the simulated contract. See Reyes v. Jusino , 116 D.P.R. 275, (1985), 16 P.R.

Offic. Trans. 338, 349, April 3, 1985 citing A. Rodríguez Adrados, Escrituras, Contraescrituras y Terceros, XXII Anales de la Academia Matritense del Notariado 229 *et seq*. (1978)("In order to overcome this result, a device imported from France was introduced into the social and economic life. It was used by the contracting parties to protect their interests via-a-vis the simulated contract. The contre-lettres, counterdocument or counterstatement was introduced as a means of due and effective evidence"). The underlying simulated transaction (or false consideration) in this case was that the decedent, Mr. Félix González Figueroa, wanted certain real properties to constitute an advancement of the inheritance ("anticipo de herencia") to the five daughters he had in common with Ms. Chico. Mr. González Figueroa's intentions were expressed in a private document[1]  which was signed by Ms.

---

[1] The text of the translated private document states the following: "In Lares, Puerto Rico, on the 18th of June of 1981.

APPEAR

 Mr. Felix Gonzalez Figueroa, who states that he is of legal age, married, farmer and resident of Lares, Puerto Rico.

AND

Mrs. Aida Luz Chico Peña, who states that she is a female, of legal age, single, a homemaker and resident of Lares, Puerto Rico; and freely

STATE AND AGREE

FIRST: That they are the father and the mother of the following female children: Rosa Milagros, Jannette Vannessa, Maria del Carmen, Blanca Luz and Raquel, all bearing the last name Gonzalez-Chico.

SECOND: That with monies received from Mr. Félix Gonzalez Figueroa, Mrs. Aida Luz Chico Peña purchased in her name, the following real property

(A) From Mr. Juan Rosado, farm number 5,480, recorded on folio 207, Lares tome 114 and located on 125 Comercio Street in Lares, Puerto Rico.

(B) From Mr. Juan Bautista Gonzalez Silva, farm number 3,787, recorded on Folio 99, Lares Tome 92 and farm number 3,752, recorded on folio 9 [illegible], Lares tome 74. These two farms are comprised of two parcelas each, which share a border and are located on #126 Comercio Street in Lares, Puerto Rico.

The Public Deed by means of which property "B" described above was purchased, were granted in January 1980 but the Deeds of Sale were done in 1979.

THIRD: That with his own funds Mr. Félix González Figueroa built between 1979 and 1980 a dwelling place on the aforementioned property.

FOURTH: That the deponents state that the money paid out by Mr. Felix Gonzalez Figueroa, as explained in paragraphs Second and Third, was an advance on the inheritance that at his passing shall go to his five daughters who bear the GONZALEZ-CHICO last name, mentioned in the First paragraph and MRS. AIDA LUZ CHICO PENA so accepts.

FIFTH: Mr. Felix Gonzalez Figueroa states that he owns enough assets that these disbursements do

10

Chico and Mr. Félix González Figueroa on June 18, 1981. The private document declares that the real properties in controversy and which are registered under the name of Ms. Chico were acquired with monies from Mr. González Figueroa. In the FIFTH paragraph of the private document signed by Mr. Félix González Figueroa and Ms. Chico, the former expressed his intention that the properties bought under Ms. Chico's name be given to the daughters they have in common in concept of their inheritance.

The Plaintiff argues that in the instant case the doctrine of relative contractual simulation is applicable under the modality of the identity of the subjects as evinced by the private agreement or counterdocument or counterstatement. Plaintiff's argues that; "...there's [sic] two ways in which simulation in the subjects of the contract can occur: [u]nder the first one, the interposed third party is placed in such place to create an appearance and conceal the real purchaser or seller; under the second modality, there is no intermediary because the person that appears as a beneficiary of the contract is included as a party in such contract, thus concealing the real party in the contract. Martínez v. Colón Franco, [125 D.P.R. 15, 27-28 (1989)]. In this case the relative simulation happened as a simulation in the subjects of the contract specifically in the first modality; Aida Luz Chico Peña was interposed between the seller and Félix González, who was the real buyer of the properties, thus concealing the real purchaser of the properties (Félix González)" (Docket No. 89-1, pg. 5).

---

not affect his other children's inheritance rights nor his wife's common property and that, upon his death, he wishes that these properties, farms #3787, #3752 and 5,480 and the homes [that] were enclaved in them be adjudicated as an inheritance to his five daughters bearing the last name Gonzalez-Chico.

SIXTH: The deponents accept that if any part of this document is legally declared null and void, the rest of is shall remain valid.

SEVENTH: I, The Notary Public, having admonished the deponents of the convenience and desirability of what is herein expressed and accepted by them be done by Public Writ and Last Will and Testament, which they decide not to do at present, since Mr. Félix Gonzalez Figueroa wishes to reach an agreement with his wife and other heirs as to the properties that shall be adjudicated to each one of them at his death.

IN WITNESS WHEREOF they set their hand and seal and acknowledge this present document. Affidavit number 4677. Signed and acknowledged before me by Mr. Félix González Figueroa and by Mrs. Aida Luz Chico Peña, of the aforementioned personal information and all of whom I attest and affirm are personally known by me. In Lares, Puerto Rico, on the 18th day of June of 1981." (Docket No. 38, pgs, 32-33).

The doctrine of contractual simulation in the modality pertaining to the identity of the subjects in a contract is intricate in nature. See Martínez v. Colón Franco, 125 D.P.R. at 27-28; Francisco Ferrara, La Simulación de los Negocios Jurídicos 253, Madrid, Ed. Revista de Derecho Privado (1960). The commentator Ferrara explains that the purpose of the interposed person which serves as an intermediary that participates in a contract (negocio jurídico-juridical transaction) is to conceal the truth from those who are really interested or affected in the transaction. The interposed person serves as an intermediary or link between those that want to obtain certain legal/juridical effects from a juridical transaction (acto jurídico). The characteristics of an interposed person consist of the following; (i) the interposed person does not have a personal interest in the transaction; thus the same is interposed (between) the persons that should be directly involved in the transaction or in between those in which the patrimonial assets should be allocated; and (2) his or her function is to hide the real person (*dominus*) that is behind the transaction that wants to be concealed.  Francisco Ferrara, La Simulación de los Negocios Jurídicos 272, Madrid, Ed. Revista de Derecho Privado (1960)[2]; See also Hernández Usera v. Secr. de Hacienda Puerto Rico, 86 D.P.R. 13, 19-20 (1962).

The juridical figure of the interposed person who serves as an intermediary in contractual transactions is divided in two (2) broad categories; namely (i) the interposition by a real person; and (ii) the interposition by a simulated person, which is referred to as interposition by a fictitious person by commentator Francisco De Castro y Bravo. See Quetglass v. Carazo, 134 D.P.R. 644, 655 (1993); See also; Francisco De Castro y Bravo, El Negocio Jurídico 343, Madrid, Ed. Civitas, S.A., (1985). If the interposition is by a real person, then there is no room for contractual simulation by a fictitious person to take place, because the real person appears and acts as the real contracting party in the

---

[2]  The Spanish text is included in support of the court's statements and conclusions as there is no official translation. "Al celebrarse un negocio jurídico, cabe que se interponga una persona extraña con el fin de ocultar al verdadero interesado. Esta persona sirve de intermediario, de eslabón entre los que quieren conseguir los efectos de un acto jurídico. Los caracteres que la distinguen, en general, son: (1) Ponerse entre dos que deben ligarse directamente en el negocio, o entre los cuales debe descansar en definitiva el contenido patrimonial del mismo, sin que el intermediario tenga en el negocio un interés personal. 2. Su función de ocultar al verdadero dueño del negocio, que quiere permanecer entre bastidores. Esta figura genérica se llama persona interpuesta." Francisco Ferrara, La Simulación de los Negocios Jurídicos 272, Madrid, Ed. Revista de Derecho Privado (1960)

juridical transaction (contract).  See Francisco Ferrara, La Simulación de los Negocios Jurídicos 273–274, Madrid, Ed. Revista de Derecho Privado (1960)[3].  There is another form of contractual simulation in the modality of the identity of the subjects when there is no intermediary, is that in which the beneficiary appears as the contracting party who appears to be the *dominus* or title holder ("titular originario o inmediato") in the juridical transaction, but the person that is the *dominus* or title holder remains concealed (hidden). See  Martínez v. Colón Franco, 125 D.P.R. at 27-28. [4]

At the outset, the court concludes that there is no contractual simulation in which there is no

---

[3]  The Spanish text is included in support of the court's statements and conclusions as there is no official translation."Trataremos primeramente de la interposición real, advirtiendo de antemano que esta figura es totalmente extraña a la simulación, y que, si nos ocupamos de ella en este lugar, es para afirmar la separación indicada y acentuar sus diferencias con la persona interpuesta fingida, que es la única que tiene derecho a ocupar un puesto en la teoría de los contratos simulados.

El intermediario real actúa como *verdadero contratante* en el negocio jurídico: la relación, en lugar de desenvolverse entre las dos partes se desenvuelve entre tres personas, quedando el intermediario colocado en medio de ellas para recibir y volver a transferir, o para obligar y ser exonerado de su obligación. El último efecto del negocio jurídico se producirá entre los verdaderos interesados; pero antes es preciso que pase por la persona interpuesta, la cual, transitoria, pero necesariamente, debe adquirir para su patrimonio la propiedad o los créditos resultantes del contrato y las responsabilidades o deudas correlativas. Durante esta etapa transitoria se convierte en propietario como se convierte en deudor; pero lo uno y lo otro *realmente*, aun cuando desde el punto de vista económico no pueda decirse que su patrimonio se aumente o disminuya, que es lo que en parte ha hecho creer que se trataba de un titular aparente. Para desvanecer por completo esta ilusión juzgamos oportuno proscribir de esta figura el término equívoco de testaferro, que no aparece en nuestras leyes y que histórica y etimológicamente se reserva a la person interpuesta de carácter fingido." Francisco Ferrara, La Simulación de los Negocios Jurídicos 273-274, Madrid, Ed. Revista de Derecho Privado (1960).

[4]  The Spanish text is included in support of the court's statements and conclusions as there is no official translation. "En cuanto a la simulación en los sujetos del contrato, la misma resulta ser un poco más compleja que las demás formas de simulación. Federico De Castro y Bravo señala dos (2) formas distintas en que se puede dar esta simulación: mediante la interposición de persona ficticia o mediante la puesta a nombre de otro. De Castro y Bravo, op. cit., págs.. 342-344. Bajo la primera figura la persona interpuesta aparece para crear una mera apariencia y ocultar al verdadero adquiriente o vendedor. Bajo la segunda figura no existe intermediario, sino que se hace figurar como parte a la persona a la que se quiere beneficiar con el negocio permaneciendo oculta la persona que verdaderamente realiza el mismo: [e]n esta última figura se suprime el intermediario, y se oculta el negocio de transmisión, haciendo que aparezca el beneficiario como titular originario o inmediato." Martínez v. Colón Franco, 125 D.P.R. at 27-28.

intermediary and in which beneficiary appears as the contracting party that is the titleholder or *dominus* because the counterdocument discloses that the beneficiaries of such real estate properties, in concept of an advancement of the inheritance (*inter-vivos* donation), are the five daughters that Mr. Félix González Figueroa and Ms. Chico have in common.

Plaintiff further argues that in the instant case, contractual simulation in the modality of the identity of the subjects occurred through the interposition by a fictitious or simulated person (intermediary), that being Ms. Chico. Commentator Ferrara explains in detail the requirements that must be satisfied in a contractual simulation by interposition of a simulated person. Ferrara states that for this type of simulation to occur, not only must there be an agreement between the person that promotes the interposition of the interposed person (or the straw person/intermediary) that will appear in the contract, but that the third (other) contractual party must be aware (have knowledge/be knowledgeable) of the simulated agreement in which the interposed person is appearing in the place of (in lieu) the real contracting party (the *dominus* or titleholder). According to Ferrara, if the simulated agreement is unbeknownst to the third party, then there is no contractual simulation, but rather a type of unilateral simulation. See Francisco Ferrara, La Simulación de los Negocios Jurídicos 281, Madrid, Ed. Revista de Derecho Privado (1960).[5]

The court finds that contractual simulation in the modality of the identity of the subjects through the interposition by a fictitious or simulated person did not occur in the instant case because it was unbeknownst to the sellers, or the third party in the asset purchase agreements, that Ms. Chico

---

[5] The Spanish text is included in support of the court's statements and conclusions as there is no official translation. "En cambio, para que se produzca la interposición simulada no basta el acuerdo entre el interponente y el testaferro, sino que se requiere asimismo la inteligencia con el tercer contratante. En efecto, consistiendo el acuerdo simulatorio en que comparezca otra persona en el lugar del verdadero contratante, se necesita que tome parte en el mismo acuerdo el tercero, que debe entablar la relación con persona distinta de la que figura en el contrato. Sin su consentimiento tendríamos un próposito unilateral de simulación, no una simulación. Si al quitar la apariencia ha de resultar visible el negocio celebrado primitivamente con el contratante oculto, que debe sustituirse a la figura postiza del testaferro, es preciso que el tercero haya consentido originariamente en tratar con aquél y conozca el disfraz que adopta." Francisco Ferrara, La Simulación de los Negocios Jurídicos 281, Madrid, Ed. Revista de Derecho Privado (1960).

14

was appearing as an interposed person (intermediary) in these particular simulated contracts. [6]

In order for a contractual simulation through the interposition by a real person that serves as an intermediary to take place the following requirements must be met:  (1) there must be three (3) persons, one that acts in his or her own name to form the contractual relationship, which is of actual interest to the person that maintains himself or herself hidden (concealed) from the contract; and (2) the existence of an agreement between the person that promotes the interposition and the person interposed which determines the manner in which the intermediary will employ the juridical (legal) duties/obligations that he or she has obtained under his or her own name. It is not necessary for the third party to know that there is an interposed person contracting before him in order for the interposition by a real person to occur. In fact, most of the times the third party does not know that he or she is contracting with a real person that is serving as an intermediary. See Francisco Ferrara, La Simulación de los Negocios Jurídicos 277, Madrid, Ed. Revista de Derecho Privado (1960).[7]

---

[6]   The example Ferrara provides is the following:  if A wants to purchase from B by means of P, the person interposed, then the seller must know of the simulation and partake (participate) in the same. Otherwise the purchase would be for the person interposed, P (the straw person = "testaferro") and not for A. See Francisco Ferrara, La Simulación de los Negocios Jurídicos 281-282, Madrid, Ed. Revista de Derecho Privado (1960).

The Spanish text is included in support of the court's statements and conclusions as there is no official translation. "O, de otro modo, si A quiere comprar de B por medio de P, persona interpuesta, es preciso que el vendedor conozca la simulación y tome parte de ella, pues en otro caso la adquisición sería para el testaferro P y no para A. El acuerdo de simular que sólo existe entre el interponente y la persona interpuesta es, respecto al tercero, una mera reserva mental y, por tanto ineficaz."  Francisco Ferrara, La Simulación de los Negocios Jurídicos 281-282, Madrid, Ed. Revista de Derecho Privado (1960).

[7] The Spanish text is included in support of the court's statements and conclusions as there is no official translation. "Examinemos ahora las condiciones de que resulta la interposición real. Se necesita: 1. La existencia de tres personas, una de las cuales se presta a formar, en su propio nombre, el vínculo que interesa en realidad a otra que permanece ajena al contrato." "2. El acuerdo entre el que promueve la interposición y la persona interpuesta, acuerdo que determina cómo el intermediario ha de usar del efecto jurídico que obtiene en nombre propio. En cambio no hace falta que el tercero conozca la cualidad de persona interpuesta de quien se encuentra frente a él. Es más: la mayor parte de las veces *no debe* conocerla, porque el engaño va contra tercero. De todos modos, ese conocimiento carece de importancia desde el punto de vista de la eficacia del acto." Francisco Ferrara, La Simulación de los Negocios Jurídicos 277, Madrid, Ed. Revista de Derecho Privado

This court concludes that in the instant case, the requirements of interposition by a real person (or intermediary) are satisfied. The sellers of the real estate property were unaware that Ms. Chico was acting as an intermediary (interposition by a real person) in these transactions (asset-purchase agreements). However, such scienter is not required. The counterdocument or counterstatement evinces that the monies to buy the real estate properties detailed in the same, were provided by Mr. Félix González Figueroa because he wanted these properties to constitute an advancement of the inheritance for his five (5) daughters. The counterdocument clearly shows that the intention of Mr. Félix González Figueroa was to make an *inter-vivos* donation of certain real estate properties to his five (5) daughters who at the time were minors. The testimony of Ms. Chico so confirms. This court finds that Ms. Chico served as the real person that was interposed between the seller of the real estate properties and the real party in interest; Mr. Félix González Figueroa, who remained hidden from the asset-purchase agreements regarding the real estate properties. The counterdocument which was signed by both Ms. Chico and Mr. Félix González Figueroa is the agreement in which Ms. Chico and Mr. Félix González Figueroa establishes and reveals that the real estate properties which were purchased by Ms. Chico with monies from Mr. Félix González Figueroa in reality constitute an advancement of the inheritance of their five daughters, not an *inter-vivos* donation of these real estate properties to Ms. Chico. The counterdocument is the agreement by which the role of Ms. Chico as an intermediary is clearly established and defined, and establishes that she had the obligation to transfer these real estate properties to her five (5) daughters.

Commentator Ferrara explains that the legal repercussions (effects) of an interposition by a real person (or intermediary) are simple and defined, since the interposed person is juridically granted (invested) with all of the rights and obligations that are derived from the contract (juridical transaction) and the interposed person becomes the *dominus* (or titleholder) as long as the cause of the interposition is legal (lawful). See  Francisco Ferrara, La Simulación de los Negocios Jurídicos 277, Madrid, Ed.

(1960).

Revista de Derecho Privado (1960)[8]; Pérez Fleites v Garrido Pérez and the Conjugal Partnership composed of Garrido Pérez and Corujo Ramsey, 2010 PR App. Lexis 2965, *37 (P.R. Ct. App. 2010) The rights that are derived from the contractual transaction enter the patrimony (assets/estate) of the interposed person and in the case of bankruptcy form part of the interposed person's bankruptcy estate. Id at 277-278.[9]

Although not specifically addressed by the parties, the facts of this case compel the court to consider whether the interposition in a contract (transaction) by a real person (intermediary) for an illegal purpose or for a cause which is contrary to certain dispositions of the Puerto Rico Civil Code. See Francisco Ferrara, La Simulación de los Negocios Jurídicos 277-278, Madrid, Ed. Revista de Derecho Privado (1960). Article 1227 of the Puerto Rico Civil Code provides that; "[c]ontracts without consideration or with an illicit one have no effect whatsoever. A consideration is illicit when it is contrary to law and good morals." 31 L.P.R.A. §3432. Contractual simulation has a direct effect on the concept of false consideration in contracts and is proscribed in Article 1228 of the Puerto Rico Civil Code which establishes that; "[t]he statement of false consideration in contracts shall render them void, unless it be proven that they were based on another and real and licit one." 31 L.P.R.A. §3433. Parties may not employ contractual simulation and interposition by a real person (intermediary) to circumvent the requirement that the dissimulated (underlying) contract must have a licit (lawful/legal) cause. If the contract is for an illegal cause, the same is null and void and devoid

---

[8] The Spanish text is included in support of the court's statements and conclusions as there is no official translation. "Los efectos de la interposición son tan sencillos como definidos. La persona interpuesta queda investida jurídicamente de la relación que establece en su propio nombre y, por tanto, se convierte en propietario y acreedor y tiene el pleno ejercicio de tales derechos, siendo válidas e inatacables las enajenaciones hechas a terceros, aunque éstos conozcan su cualidad, porque, de todos modos, emanan del titular legítimo." Francisco Ferrara, La Simulación de los Negocios Jurídicos 277, Madrid, Ed. Revista de Derecho Privado (1960)

[9] The Spanish text is included in support of the court's statements and conclusions as there is no official translation. "Y al entrar en su patrimonio estos derechos constituyen una garantía para sus acreedores personales, y en caso de quiebra forman parte de la masa de bienes, quedando el mandante o dator fiduciae reducido a la categoría de un simple quirografario no privilegiado, excepto en aquello en que le sean aplicables las normas de los artículos 802 y subsiguientes del Código de Comercio." Id at 277-278.

17

of any juridical effects (consequences/ramifications).

In the instant case, the court concludes that Ms. Chico served as the real person that was interposed between the seller of the real estate properties and the real party in interest; namely Mr. Félix González Figueroa, to circumvent various legal dispositions regarding the disposition of conjugal assets by a spouse and illicit (ineffective) inter-vivos donations to (forced/ "legitimarios") heirs by Mr. Félix González Figueroa that are contrary to the Puerto Rico Civil Code. It is an uncontested fact that at the time Ms. Chico bought the real estate properties, Mr. Félix González Figueroa was legally married with Mrs. Juana Collazo under the economic regime of a conjugal partnership. Article 1307 of the Puerto Rico Civil Code provides; "[a]ll the property of the marriage shall be considered as partnership property until it is proven that it belongs exclusively to the husband or to the wife." 31 L.P.R.A. §3647.

Article 91 of the Puerto Rico Civil Code provides that;

"[b]oth spouses shall be administrators of the community property, except when otherwise stipulated, in which case one of the spouses shall grant a mandate to the other to act as administrator of the community property.

Purchases made by either of the spouses out of said property shall be valid when they comprise things or articles for personal or family use in accordance with the social and economic standing of the family. Provided, that either of the spouses may make said purchases in cash or credit.

The real property of the conjugal community may not be alienated or encumbered, under penalty of nullity, except with the written consent of both spouses. Nothing above provided shall be construed as to limit the liberty of the future spouses to execute articles of marriage." 31 L.P.R.A. §284.

Article 1313 of the Puerto Rico Civil Code establishes that;

"[n]otwithstanding the provisions of section 284 of this title, neither of the two spouses may donate, alienate or bind for a consideration the personal or real property of the community property without the written consent of the other spouse, excepting things for personal or family use in accordance with the social or economic standing of both spouses.

Any disposal or administration act made with respect to said property by either of the spouses in violation and any other section of this title shall not affect the other spouse or his heirs.

The spouse engaged in commerce, industry or a profession may, for good cause, acquire or dispose of the personal property used for such purposes without the consent of the other spouse. Said spouse shall, however, be liable for the damages he or she may cause by said acts to the community property. This action shall be exercised

18

exclusively at the time of the dissolution of the community property." 31 L.P.R.A. §3672.

In the instant case, Mr. Félix González Figueroa provided Ms. Chico with monies (funds) to purchase certain real estate properties that are described in the private document. Pursuant to Article 1307 of the Puerto Rico Civil Code the monies given by Mr. Félix Figueroa to Ms. Chico were part of the conjugal assets (community assets) he had with Mrs. Juana Collazo. The Debtor has not presented evidence which would indicate otherwise (exclusive nature/ "privativo").  Moreover, Article 1313 of the Puerto Rico Civil Code, further establishes that neither of the two spouses may donate personal or real property of the community property without the consent of the other spouse. Consequently,  the asset purchases of the real estate properties described in the private document were transactions in which the real party that purchased these properties was the conjugal partnership composed of Mr. Félix González Figueroa and Mrs. Juana Collazo, which was represented by Ms. Chico as the interposed real person (intermediary/straw person). See Quetglass v. Carazo, 134 D.P.R. 644, 654-658 (1993) in which the Supreme Court of Puerto Rico analyzes the effect of various simulated asset purchase agreements of real estate properties executed by a straw person, with monies belonging to the conjugal partnership (community property). The Debtor did not argue or offer evidence that a community of assets was created at the time between the conjugal partnership (comprised of Mrs. Juana Collazo and Mr. Félix González Figueroa) and Ms. Chico. See Caraballo Ramírez v. Acosta, 104 P.R. 474 (1975), 4 P.R. Offic. Trans. 658 (1975). The private document sets forth the reason Mr. Félix González Figueroa wanted Ms. Chico to act as an intermediary in the purchase of the real estate properties. He wanted these real estate properties to constitute an advancement of the inheritance ("anticipo de herencia") to the five daughters he had in common with Ms. Chico, who at the time of the asset purchases and of the private document were minors.

## Conclusion

In view of the foregoing, the court finds that Ms. Chico served as the real person (intermediary) which was interposed for an unlawful purpose between the sellers of the real estate properties and the real party that purchased these properties which was the conjugal partnership composed of Mr. Félix González Figueroa and Mrs. Juana Collazo. The court concludes that Mr.

Félix González Figueroa disposed of monies which belonged to the conjugal partnership to pursue ineffective (illicit) *inter-vivos* donations of real estate properties to the daughters he had in common with Ms. Chico. As a result, the real estate properties included in the private document are not property of the Debtor's estate under 11 U.S.C. §541 but belong to the conjugal partnership which was composed of Mrs. Juana Collazo and Mr. Félix González Figueroa.

Judgment shall be entered accordingly.

SO ORDERED.

In San Juan, Puerto Rico, this 14th day of November 2012.

Enrique S. Lamoutte
United States Bankruptcy Judge